# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL LOPEZ, | 1:09-CV-01158 AWI JMD HC |
| Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| ANTHONY HEDGPETH, | |
| Respondent. | THIRTY (30) DAY DEADLINE TO FILE OBJECTIONS |

Manuel Lopez ("Petitioner") is a California prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a December 20, 2006, jury verdict finding Petitioner and co-defendant (Juan Ramon Aguilar) guilty of attempted premeditated and deliberate murder (Count 1; Cal. Penal Code §§ 187(a), 664). Petitioner was further convicted of two counts of assault with a firearm (Counts 2 and 3; Cal. Penal Code § 245(a)(2)) and one count of possession of a firearm by a convicted felon (Count 4; Cal. Penal Code § 12021(a)(1)).[1] The jury found true that Petitioner had discharged a firearm causing great bodily injury or death (Cal. Code § 12022.53(d)) in his commission of the attempted murder. The jury further found Petitioner had personally inflicted great bodily injury (Cal. Penal Code § 12022.7(a)) in the commission of Counts 2 and 3. Lastly, the jury

---

[1] The jury acquitted Petitioner's co-defendant on Counts 2 and 3. The State did not charge Petitioner's co-defendant with Count 4.

found that with regards to Counts 1, 2, and 3 that Petitioner had acted in concert with his co-defendant to commit a hate crime in which Petitioner used a firearm (Cal. Penal Code § 422.75(b)).

During a separate proceeding at which Petitioner waived his right to a jury trial, the trial court found that Petitioner had a prior conviction within the meaning of California Penal Code sections 667(a), (b)-(i) and 11710.12(a)-(d). Petitioner was further found to have served a prior prison term within the meaning of California Penal Code section 667.5(b). The trial court sentenced Petitioner to an aggregate term of fifty-six years-to-life in prison plus an additional term of life in prison with the possibility of parole.

Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District, which issued a reasoned opinion on April 21, 2008, affirming Petitioner's conviction and sentence. (*See* Pet. App. A.)

Petitioner filed a petition for review with the California Supreme Court.[2] (Lod. Doc. 1.) The California Supreme Court issued a summary denial of the petition on July 30, 2008. (Pet. App. B.)

On June 29, 2009, Petitioner filed the instant federal petition for writ of habeas corpus.

On January 19, 2010, Respondent filed an answer to the petition.

## FACTUAL BACKGROUND[3]

Lopez lived with his younger sister, Margarita Lopez ("Margarita"), her infant daughter, their grandmother, and Aguilar at a house on East Illinois Avenue in Fresno. Aguilar was the father of Margarita's children, and Aguilar's mother also then lived in the house with the Lopezes. The neighborhood was mainly Hispanic, but there were people of other races and ethnicities in the neighborhood as well.

One of these neighbors was Albert Hood, Sr., an African-American male who also lived at a house on East Illinois Avenue, which was about three blocks away from Margarita's house. Hood's girlfriend, Felicia Tobias, had been living with him until the first part of September 2005, when she moved out and went to live with her cousin, Georgina Salazar, at a house that was across the street from Margarita's house. Tobias testified that Hood was still her boyfriend as of September 2005, but that they "were having problems ."

---

[2] The Court notes that Lodged Document No. 1 is missing approximately half of the pages as Respondent failed to include any even numbered pages that were part of the original petition for review.

[3] These facts are derived from the California Court of Appeal's opinion issued on April 21, 2009. (*See* Pet. App. A.) Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir. 2009).

Hood walked past Salazar's house at least twice a day. In the morning, he would walk past Salazar's house as he walked from his house to an AM/PM store where he would get a ride to work. After work, he would walk home from the same location. He also would walk from his house to Salazar's house to visit Tobias. Margarita often saw Hood making these walks.

Hood testified that, during these walks, he frequently saw two or more young men, including on occasion, appellants, hanging out in front of Margarita's house. According to Hood, "If there was one or two of them, they would speak. If there was a gang of them, they would look at me like what you looking at nigger. Don't be looking over here."

The afternoon of September 27, 2005, Lopez was outside with a man Margarita knew only as "Duck." That afternoon, Margarita heard Lopez and Duck make racial comments about Hood. She heard them talking to "some girls across the street." Lopez said to the women, "what's up with all these niggers on the block." Duck then said that "he was gonna handle that shit." Margarita told Lopez "not to start problems at my house." Aguilar was not present during the conversation. Margarita later testified that Aguilar had Black friends, liked watching BET, and that she had never heard him speaking bad about Black people.

## A.
## Shooting Incident

The jury heard slightly different accounts of the shooting of Hood by Lopez on the night of September 27, 2005, from four witnesses.

**1. Margarita's Testimony**

According to Margarita, at approximately 9:00 p.m. that night, Aguilar came home. She tried to tell him what she overheard Lopez and Duck saying that afternoon-that Duck said he was "gonna handle" the fact that there were Blacks on the block-but he did not pay attention to her. Instead, he went outside to talk to a man named Joey. Lopez also was outside, talking to Duck. There were several other men outside at the time. As Margarita watched, Duck took a handgun out of the trunk of his car and gave it to Lopez, who then put it somewhere in his pants. Later, Margarita changed her testimony on this point, stating that Aguilar had not gotten home yet when she saw Duck give the gun to Lopez. A short while later, Margarita saw Hood, who was across the street, walking in the direction of Salazar's house. Because the lights were on outside her house, Margarita could easily see it was Hood.

During this time, Aguilar and Lopez and the other men were outside Margarita's house. According to Margarita, Hood approached the group of men and said, "What's up then?" Hood and Aguilar walked towards one another. Then, without warning, Hood suddenly hit Aguilar in the face, causing Aguilar to stagger to the side. Margarita said Aguilar looked "dazed out."

Immediately after Hood had hit Aguilar, Lopez fired three shots at Hood. Margarita heard three gunshots. She turned and ran inside. She then turned off all the lights on the house. Lopez, along with several other men, "just jumped in cars and took off." Duck left by himself in his own car.

The police came to Margarita's house about half an hour after the shooting. Margarita said she did not talk to the police at that time because she "didn't want to be involved in nothing." She was interviewed by the police about the incident a couple of days later; during the interview, she told the police that she did not see anything.

**2. Tobias's Testimony**

Tobias was outside in the front yard of Salazar's house at about 10:00 p.m. on the night of September 27, 2005. She saw Hood and his son, Albert Hood, Jr. ("Albert"), walking up the street but before he could get to Salazar's house, three young men approached them: Lopez, Aguilar, and another man that Tobias did not know. Tobias heard one of the young men say, "[Y]ou didn't get the fucking message. We don't want no fuckin' niggers on this block." Tobias then saw Hood hitting Aguilar in the face whereupon "Manuel pulled his gun to shoot" Hood. Tobias claimed she heard "at least six, seven gunshots."

After Hood was shot, Lopez and Aguilar and the other man "jumped in their car." Tobias then "directly told them to their faces that" she was going to call the police. Lopez responded that he "didn't give a fuck." Tobias saw Lopez wrap the handgun he was holding in a red bandana as he ran to the car. Aguilar drove away in a black Honda sedan; Lopez was in the front passenger seat.

Tobias went to Hood's aid. She dragged him from the street to Salazar's house. After getting Hood into the house, she called 911. Shortly thereafter, police and emergency medical services personnel came to Salazar's house. Tobias testified that when she spoke with the police and made a statement, the incident was still fresh in her mind. According to Tobias, "[w]hat I told [the police officer] back then I can't really remember because it's been a long, long time. But whatever I did say, that was what was the truth."

Tobias also admitted that she had a 2006 felony conviction for evading police officers.

On cross-examination, Lopez's trial counsel stated "I'm gonna have to walk you through your prior statement because it was very different than the statement you gave today." He proceeded to do so, by, for example, pointing out that in her prior statement to police officers (in the police report), Tobias stated that she ran outside Salazar's house after she heard gunshots. However, Lopez's trial counsel was never able to get Tobias to explicitly admit that she never saw the shooting.

**3. Hood's Testimony**

Hood testified that he walked to Salazar's house at about 11:00 p.m. on September 27, 2005. He was going to the house to get Tobias because she had told his son, Albert, that she "wanted to come home" to his house. Hood was accompanied by his son, Albert. Hood was on the north side of the street, across from Margarita's house, because he "didn't want no problems." He had been told by Tobias that "they were gonna beat me up if I walked down the street again." Hood understood "they" to mean Lopez and Aguilar. Tobias also told Hood that she had told "them that they couldn't whoop [Hood].... So she said then they said that they would shoot me."

When Hood got to Salazar's house, he talked briefly with Tobias. As they stood outside the house talking, Hood saw "a bunch of cars coming, people getting out and stuff at" Margarita's house. Tobias said she had to gather her clothes before she could go with Hood; he said he would go get his car and come back for her.

Hood and Albert started to walk home. Three young men came up to them. Hood said Aguilar was in front of the other two men, one of whom was Lopez. Lopez and the other man were behind Aguilar "on each side." Hood said that he had seen Lopez on the porch in front of Margarita's house a couple of times before that night, but they had never spoken. Hood said that he had once talked to Aguilar about "hooking up some music in his car or something."

Aguilar stopped within two-and-a-half to three feet of Hood. Aguilar said, "Hey dog, can I holler at you?" Hood replied, "I ain't no dog, but you can holler all you want." After Hood told his son to step back, Aguilar said, "Did you get my message?" Hood said, "[W]hat message?" Aguilar said, "We don't want no niggers walking down this street, mainly you." Hood then hit Aguilar, causing Aguilar to fall back.

After hitting Aguilar, Hood went after the third man while Lopez "fumble[d] for something" in the waistband of his pants. A moment later, Hood "felt something sting [his] arm." Hood told Albert to run because he (Hood) had been shot. Hood turned towards Lopez; Lopez shot Hood again, this time in the chest. Hood then turned and started to run. As he did, Hood was shot in the back. His son "kind of grabbed" him and kept running with him. Hood said he heard five gun shots altogether. The shots were fired in rapid succession.

Hood said they ran into Salazar's house. As he sat on Salazar's couch, Hood heard "cars burning out." He noticed Tobias running out with sticks and a bottle hollering some name. "So [he] told her to get back in. Just call the ambulance[.]"

**4. Albert Hood, Jr.'s Testimony**

Albert's testimony was consistent with his father's testimony about the shooting incident. However, Albert was not able to positively identify Aguilar as the "heavyset" man whom his father punched. Moreover, Albert testified that the heavyset man began saying "Didn't I tell ..." but did not finish before Hood hit the man.

**B.
Events After The Shooting Incident**

An ambulance subsequently came to Salazar's residence and Hood was taken to the hospital, where his injuries were treated. It was stipulated that, if called to testify, Dr. Davis, the physician who had treated Hood at the University Medical Center, would testify as follows:

"Albert Hood was treated by emergency room doctors at University Medical Center at 11:40 p.m. on September 27, 2005. Albert Hood was hit by three bullets resulting in four gunshot wounds to his body. A bullet entered, went through and exited Albert Hood's right arm. Another bullet hit Albert Hood's right chest. Another bullet his [ sic ] Albert Hood's right back. The bullet that hit Albert Hood's right chest caused injury to Albert Hood's internal organs. Specifically, this bullet pierced Albert Hood's liver, right diaphragm, and kidneys. The injury [ sic ] Albert Hood received from the gunshot wounds were life-threatening. Without the medical attention he received at the University Medical Center, Albert Hood would have died."

It was further stipulated that Hood's injuries constituted great bodily injury for the purposes of the charged enhancements pursuant to sections 12022.7 and 12022.53, subdivision (d).

Appellants did not testify at trial.

(Pet. App. A at 11-16.)

\\\

\\\

**DISCUSSION**

**I.     Jurisdiction**

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. While Petitioner is currently incarcerated at Salinas Valley State Prison,[4] his conviction arose from a judgment in the Fresno County Superior Court. As Fresno County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus. *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

**II.    AEDPA Standard of Review**

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions. *See Lockyer v. Andrade*, 538 U.S. 63, 70 (2003). Thus, the petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1))*, overruled in part on other grounds*, *Hayward v. Marshall*, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); *see Lockyer*, 538 U.S. at 70-71.

\\\

\\\

---

[4] Soledad is in Monterey County, which falls within the boundaries of the Northern District of California. 28 U.S.C. § 84(a).

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. *See Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006) *overruled in part on other grounds*, *Hayward*, 603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id*. (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id*.  Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id*. at 72 (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents need be reasonably applied, we may look for guidance to circuit precedents"); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue....This does not mean that Ninth Circuit caselaw is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same ground as the prior order). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. *Bailey v. Rae*, 339 F.3d 1107, 1112-13 (9th Cir. 2003). Here, the California Court of Appeal and the California Supreme Court reached the merits of Petitioner's claims. As the California Supreme Court's decision was a summary denial, the Court looks through that decision to the decision by the California Court of Appeal. *See Nunnemaker*, 501 U.S. at 804.

\\\

\\\

\\\

1  **III.    Review of Petitioner's Claims**

2      The petition for writ of habeas corpus contains four grounds for relief.  In his first ground for

3  relief, Petitioner alleges that the trial court's denial of Petitioner's continuance motion resulted in a

4  violation of his due process rights.  Petitioner's second ground for relief contends that he was

5  deprived his right to counsel as his trial counsel was constitutionally deficient.  In his third ground

6  for relief, Petitioner argues that the prosecutor committed misconduct in misstating the reasonable

7  doubt standard during closing arguments.  Lastly, Petitioner's argues that the trial court's imposition

8  of the upper terms for the substantive offenses and enhancements violated his Sixth Amendment

9  right to a jury.

10      *A.     Ground One: Denial of Continuance*

11      Petitioner's first ground for relief contends that the trial court's denial of his continuance

12  motion resulted in a violation of his due process rights.

13      While a "continuance is traditionally within the discretion of the trial judge," certain denials

14  of a continuance may constitute a due process violation.  *Ungar v. Sarafite*, 376 U.S. 575, 589

15  (1964).  The Supreme Court further noted in *Ungar* that:

16  > [I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. *Nilva v. United States*, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415; *Torres v. United States*, 270 F.2d 252 (C.A.9th Cir.); *cf. United States v. Arlen*, 252 F.2d 491 (C.A.2d Cir.).

22  *Id*. at 589-90.

23      In *Morris v. Slappy*, 461 U.S. 1 (1983), the Supreme Court reiterated its holding in *Ungar*,

24  finding that, "[t]rial judges necessarily require a great deal of latitude in scheduling trials . . .

25  Consequently, broad discretion must be granted trial courts on matters of continuances." *Id*. at

26  11-12. "The concept of fairness, implicit in the right to due process, may dictate that an accused be

27  granted a continuance in order to prepare an adequate defense." *United States v. Bogard*, 846 F.2d

28  563, 566 (9th Cir. 1988), *superseded on other grounds as noted in Simpson v. Lear Astronics Corp.*,

77 F.3d 1170, 1174 (9th Cir. 1996); *see also Houston v. Schomig*, 533 F.3d 1076, 1079-1080 (9th Cir. 2008). The Ninth Circuit has previously examined four factors, derived from its decision in *United States v. Flynt*, 756 F.2d 1352, 1359-61 (9th Cir. 1985), in assessing whether the trial court's denial of a continuance was so arbitrary as to violate due process. *See Armant v. Marquez*, 772 F.2d 552, 556-57 (9th Cir. 1985). The factors considered are: (1) the defendant's diligence prior to the request; (2) the likelihood that the continuance would have satisfied the defendant's needs; (3) the inconvenience a continuance would have caused to the court and the prosecution, including the timing of the request ; and (4) the prejudice to defendant as a result of the court's denial of the motion. *See United States v. Zamora-Hernandez*, 222 F.3d 1046, 1049 (9th Cir. 2000). The most critical question in this four factor inquiry is whether petitioner was prejudiced by the trial court's denial of his continuance motion. *United States v. Mejia*, 69 F.3d 309, 316 (9th Cir. 1995); *see also Armant*, 772 F.2d at 556-557 (9th Cir. 1985) (finding that at a minimum, petitioner must demonstrate prejudice stemming from the court's denial of a request for a continuance in order to establish a due process violation).

Petitioner moved for a continuance just prior to the trial court's issuance of jury instructions and after closing arguments had been made. Petitioner's counsel averred to the court that a continuance was necessary to investigate a letter that had recently come into Petitioner's possession. The letter was purportedly written by a Priscilla Castillo and addressed to "Manuel." (Suppl. CT, Vol. 1, at 12-13.) The letter contained allegations regarding Felicia Tobias, a prosecution witness. (Id. at 13.) The letter alleged that Ms. Tobias had told some people that she had been offered a home, a new car, and a new location in addition to receiving other favors (trip to Taco Bell, Newport cigarettes, and her preference of yards) in exchange for her testimony against the defendants. The trial court denied the motion.

The California Court of Appeal found that the trial court's denial of Petitioner's continuance motion was not arbitrary. The state appellate court noted that:

> Our review of the record here indicates that the trial court carefully considered the circumstances and contents of the Castillo-Duarte letter before denying the continuance. After learning about the Castillo-Duarte letter, the trial court reviewed its notes on the testimony of Tobias. The trial court also noted that, while it was not discounting or accepting the contents of the Castillo-Duarte letter, "it is vague at best.

U.S. District Court
E. D. California

10

> She [Tobias] lied on the stand. There's absolutely no specificity to that." The trial court noted that the investigation of the Castillo-Duarte letter would require three investigations-one by each of the two co-defendants and one by the prosecution.
>   In response to the suggestion that there was a potential *Brady* violation, the District Attorney in this case made the following representation to the trial court: "I would also represent that no one in our office makes any promises on our cases, Your Honor." The trial court accepted the representation.
>   The trial court stated that it would consider the following factors in denying the continuance: 1) the stage of the proceedings when the motion was made, 2) whether the motion was timely made, 3) the prospect that the jury would accord it undue emphasis, and 4) the significance of the evidence. The trial court noted that the case had proceeded past closing arguments and that the motion for a continuance appeared timely. The trial court noted its belief that the continuance would be longer than a couple of days because multiple investigations were required to properly evaluate the Castillo-Duarte letter. The trial court thought that it could instruct the jury properly so that there would be no undue emphasis. The trial court noted that the evidence was not significant in that "at very best" "there would be impeachment testimony as to this one witness." In light of these factors, the trial court concluded that a grant of a continuance to investigate the letter was not warranted. The trial court also rejected the contention that there was prosecutorial misconduct stating that "there is precious little basis" in the letter for that contention.
>   We conclude that, on this record, the trial court did not abuse its discretion. The trial court carefully considered the circumstances of the case and reached conclusions that were within the bounds of reason. Although appellants contend that the continuance would be short, we agree with the trial court that the continuance would not be short. We can foresee interviews of Castillo and Duarte by each of the three parties, review of recent prison records to assess the credibility of the allegations, and interviews with Tobias to respond to these allegations. These interviews and investigations likely would not be completed within a couple of days, and the trial court's conclusion that it would take three to four weeks is well within the bounds of rationality. Furthermore, the significance of the evidence in the Castillo-Duarte letter is undermined by the District Attorney's representation that his office does not make promises in their cases. The trial court accepted that representation, and it was well within its discretion to do so. Thus, the trial court did not abuse its discretion in denying the continuance

(Pet. App. A at 15-16.)

The Court finds that the state court's decision was not an objectively unreasonable application of Supreme Court precedent.  The trial court's denial was not so arbitrary as to constitute a due process violation.  As the Ninth Circuit noted, "at a minimum, however, in order to succeed the appellant must show some prejudice resulting from the court's denial." *Armant*, 772 F.2 at 557.  Here, Petitioner has failed to establish that he was prejudiced by the trial court's denial as Petitioner has not shown that with more time he would have been able to establish a *Brady* violation.  Petitioner has failed to submit any declaration from the letter's author attesting to the veracity of the letter's statements.  Thus, Petitioner has failed to offer anything more than conclusory allegations of prosecutorial misconduct with regards to the letter.  The Court finds such allegations unavailing in

light of the prosecutor's averment to the trial court that the District Attorney's office had made no promises to Ms. Tobias. As Petitioner has not demonstrated prejudice stemming from the trial court's denial of the continuance motion, Petitioner is not entitled to habeas corpus relief on this ground.

### B. Ground Two: Ineffective Assistance of Counsel

In his second ground for relief, Petitioner alleges that his trial counsel was deficient and he was therefore denied his Sixth Amendment right to counsel. Specifically, Petitioner alleges counsel was ineffective in his cross examination of Ms. Tobias as counsel failed to obtain Ms. Tobias' admission that she did not see the shooting occur, misstated Ms. Tobias' testimony during closing arguments, and failed to question Ms. Tobias regarding any benefits or promises made to her by the District Attorney's office in exchange for testifying. Additionally, Petitioner contends counsel was ineffective in questioning Ms. Tobias and handling of evidence regarding the hate crime allegations and premeditation.

An allegation of ineffective assistance of counsel requires that a petitioner establish two elements–(1) counsel's performance was deficient and (2) petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687(1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994). Under the first element, the petitioner must establish that counsel's representation fell below an objective standard of reasonableness, specifically identifying alleged acts or omissions which did not fall within reasonable professional judgment considering the circumstances. *Strickland*, 466 U.S. at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995); *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness'")(quoting *Strickland*, 466 U.S. at 688). Judicial scrutiny of counsel's performance is highly deferential and there exists a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, the petitioner must show that counsel's errors were so egregious that the petitioner was deprived of the right to a fair trial, namely a trial whose result is reliable. *Strickland*, 466 U.S. at

687.  To prevail on the second element, the petitioner bears the burden of establishing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Quintero-Barraza*, 78 F.3d at 1348 (quoting *Strickland*, 466 U.S. at 694).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697.  Since prejudice is a prerequisite to a successful claim of ineffective assistance of counsel, any deficiency that was not sufficiently prejudicial to the petitioner's case is fatal to an ineffective assistance of counsel claim.  *Id*.

### 1.   *Cross Examination of Tobias Regarding Previous Statements*

Petitioner contends that trial counsel was ineffective in cross examining Ms. Tobias regarding her previous statements to the police.  Petitioner admits that the witness was "evasive" but faults counsel for failing to get Ms. Tobias to admit that her statements to the police contradicted her testimony during the trial that she saw the shooting.  The California Court of Appeal found that counsel was not defective in this regard as "trial counsel was able to get Tobias to admit that what she had stated to the police at that time was fresher and more accurate." (Pet. App. A at 17.)  The record reveals that the appellate court's conclusion is correct.  Counsel asked Ms. Tobias if things were fresh in her mind when she talked to the police, to which she replied affirmatively.  (RT at 217.)  She later confirmed that what was stated to the police "was more fresh" on her mind and that it had been a long time since she gave her statement and she could have forgotten things.  (Id. at 219-20.)  Ms. Tobias replied affirmatively to a question characterizing her prior statement as "very different than the statement you gave today." (Id. at 217.)  In light of this record, the state court's finding was not an objectively unreasonable application of *Strickland*.

### 2.   *Closing Argument*

Petitioner additionally contends that trial counsel was deficient in misstating Ms. Tobias' testimony during his closing arguments.  Trial counsel commented during closing arguments that Ms. Tobias had testified that, "it's fresher on my mind the night this happened.  Whatever I said that day, that's what really happened.  She said she was inside, didn't see anything, and ran outside."

(Pet. at 12.) The California Court of Appeal found that

> It thus appears that trial counsel did get Tobias to admit that what was in the police report was more accurate. And the police report indicated that she stated that she was inside and did not see the shooting. Although trial counsel could not get Tobias to state that she never saw the shooting, and Tobias subsequently asserted that "I know what the police report says, but I know what I remember," we believed there was ample evidence from Tobias's cross-examination to support trial counsel's assertion that Tobias had admitted "it was fresher on my mind the night this happened. Whatever I said that day, that's what really happened. She said she was inside, didn't see anything, and ran outside."
>
> Moreover, even if trial counsel erred in failing to get Tobias to admit that she did not see the shooting, there was evidence from other percipient witnesses that supported trial counsel's closing argument. Specifically, Hood testified that Tobias was inside the house and then she ran outside the house after the shooting. Margarita and Albert also did not observe the presence of Tobias during the shooting incident.

(Pet. App. A at 17-18.)

The Court finds the appellate court's decision persuasive. The record reveals an ample basis for trial counsel to have made such comments. More importantly, it is unclear how trial counsel's comments would have prejudiced Petitioner. Petitioner alleges that the jurors realized the statements were an incorrect characterization of Ms. Tobias' testimony and that the jurors were influenced by counsel's misstatements. The Court rejects this assertions as a rational juror would have not thought counsel was misstating Ms. Tobias' testimony as Ms. Tobias confirmed things were fresh in her mind when she talked to the police, that what was stated to the police was more fresh, and that she could have forgotten things since her statement to the police. (RT at 217-20.) Even assuming that the jurors thought trial counsel misstated Ms. Tobias' testimony, Petitioner's assertion that the jurors found him guilty based solely on counsel's misstatement is pure conjecture and strains credulity.

### 3. *Cross Examination of Tobias Regarding Benefits*

Petitioner faults counsel for failing to cross examine Ms. Tobias regarding any benefits or promises made to her by the prosecutor's office. This allegation was not addressed by the state courts in their decision and thus the court conducts an independent review of the record to determine is the state court's denial of the claim was an objectively unreasonable application of *Strickland*. *See Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). First, the Court notes that the prosecutor refuted any allegations that promises were made or benefits conferred upon Ms. Tobias in exchange for her testimony at trial. Additionally, knowledge of this information stems from the Castillo

Duarte letter, which was not known to the defense until after closing arguments.  Thus, at the time of Ms. Tobias' testimony, there did not exist a basis upon which counsel could cross examine her on promises or benefits allegedly made by the prosecutor.  Consequently, the Court does not find trial counsel was deficient in failing to cross examine Ms. Tobias on this issue.

### 4.    *Handling of Hate Crime and Premeditation Evidence*

Petitioner alleges that trial counsel was ineffective in handling the evidence pertaining to the hate crime and premeditation.  Specifically, Petitioner contends that trial counsel failed to appreciate the ramification of evidence as they pertained to premeditation and hate crime.  Petitioner contends that as a result, trial counsel failed to cross examine Ms. Tobias on this point.

The California Court of Appeal agreed with Petitioner that trial counsel failed to appreciate the inculpatory nature of the evidence pertaining to the hate crime, stating that:

> After the verdict, Aguilar's trial counsel moved to dismiss pursuant to section 1118.1, Lopez's trial counsel announced that he joined in the section 1118.1 motion as to the hate crime allegation. Lopez's trial counsel asserted that the prosecution had not submitted evidence sufficient on the hate crime allegation. The trial court asked, "Wasn't there-if not an abundance, but there was multiple testimony that Mr. Lopez had made remarks about Blacks in the neighborhood prior to the actual shooting." Lopez's trial counsel responded, "I thought that was Mr. Aguilar." The record indicates that trial counsel was incorrect on this point. However, the same record does not indicate that trial counsel failed to appreciate that the prosecution had introduced evidence on the premeditation allegations.

(Pet. App. A at 18.)

The California Court of Appeal found that despite counsel's failure to appreciate the nature of this evidence, there was no prejudice resulting from this deficiency as trial counsel's cross examination of Ms. Tobias was adequate.  (Id. at 18.)  The appellate court noted that counsel undermined Ms. Tobias' credibility by alerting the jury to the discrepancies between her previous statement to the police and her testimony at trial.  The appellate court also pointed to trial counsel having elicited testimony illustrating Ms. Tobias' possible motive of lying, namely her romantic involvement with the victim, and the lack of physical evidence supporting her version of events.  (Id.)  Lastly, the appellate court noted that Ms. Tobias was not the only source of evidence supporting the hate crime enhancements as Petitioner's sister, Margarita, testified that Petitioner made derogatory comments about African Americans the afternoon prior to the shooting.

1  The Court does not find this to be an objectively unreasonable application of *Strickland*.
2  Even if counsel had appreciated the nature of the testimony, there is no reasonable allegation that
3  counsel would have been able to undermine or exclude any of the evidence nor does Petitioner allege
4  with any specificity how additional cross examination of Ms. Tobias on this issue would have
5  resulted in a more favorable outcome. The Court does not find that there is a reasonable probability
6  that the outcome was undermined by trial counsel's failure to appreciate the nature of this evidence.
7  Thus, Petitioner is not entitled to habeas corpus relief on this ground.

### C.   Ground Three: Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct during closing arguments. Specifically, Petitioner argues that the prosecutor misstated the reasonable doubt standard. The California Court of Appeal summarized the factual predicate for this claim as follows:

> In his closing argument, the prosecutor addressed the reasonable doubt standard as follows:
> "Reasonable doubt, again, is not really complex. Whatever example you're given for reasonable doubt or beyond a reasonable doubt, whatever numbers, whatever formulas you see, that's nowhere in the laws. That's just argument counsel may make. Again, reasonable doubt is just an abiding conviction in the truth of the charge. That is all it is. Nothing more complex than that. Decisions are made every day based on abiding convictions in making that decision." (Italics added.)
> The remainder of the prosecutor's comments relating to reasonable doubt accurately reflected the law. The prosecutor also told the jury, "Your sole decision is to take the law the Judge is going to give to you and apply it."

(Pet. App. A at 19-20.)

A prosecutor should not misstate the law in closing argument. *United States v. Moreland*, 509 F.3d 1201, 1216 (9th Cir. 2007) (quoting *United States v. Berry*, 627 F.2d 193, 200 (9th Cir. 1980); *United States v. Artus*, 591 F.2d 526, 528 (9th Cir. 1979). However, "[i]mproper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993); *see also Boyde v. California*, 494 U.S. 370, 384-85 (1990) (stating that "prosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court").

The appropriate standard for a federal habeas court reviewing claims of prosecutorial misconduct is the narrow standard of whether the conduct violated due process. *See Darden v. Wainwright*, 477 U.S. 168, 181(1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642

(1974)); *Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000); *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996). Prosecutorial misconduct violates due process when it has a "substantial and injurious effect or influence in determining the jury's verdict." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 443 (1995)). To succeed on a prosecutorial misconduct claim, the petitioner must initially show that the prosecutor's improper conduct "materially affected the fairness of the trial." *United States v. Smith*, 893 F.2d 1573, 1583 (9th Cir. 1990) (quoting *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986)). If left with "grave doubt" as to whether the error had substantial influence over the verdict, a court must grant collateral relief. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *Ortiz-Sandoval*, 81 F.3d at 899.

In deciding whether the prosecutor's comments rose to the level of a due process violation by rendering the defendant's trial fundamentally unfair, the reviewing court must initially examine the context in which the remarks were made. *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987) (quoting *Darden*, 477 U.S. at 179 and citing *Donnelly*, 416 U.S. at 639). Attorneys are permitted "reasonably wide latitude" in presenting their case during closing arguments and "may strike 'hard blows' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984) (quoting *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972) (per curiam)).

Here, the California Court of Appeal initially found that the prosecutor had not misstated the law on reasonable doubt.[5] The appellate court observed that:

> [T]he prosecutor did not say that the reasonable doubt standard is what is used in every day life to decide whether to get married, to change lanes, to take a vacation, or to get on a plane. Rather, he stated that "[d]ecisions are made every day based on abiding convictions in making that decision." We believe that this is a true statement, although an individual person likely would not be making decisions based on a reasonable person standard on a daily basis. Moreover, the prosecutor did not give any examples but merely reiterated the language in the jury instructions on the reasonable doubt standard. Furthermore, the prosecutor told the jury to take the law that the trial

---

[5] The appellate court alternatively found that Petitioner had waived this argument as trial counsel had failed to object during closing argument. Arguably, pursuant to the state court's procedural rejection of Petitioner's claim, this ground is procedurally defaulted. However, the burden rests with Respondent to raise a procedural default issues; thus the Court will not consider whether this ground is procedurally defaulted. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).

In a related argument, Petitioner raises ineffective assistance of counsel claim regarding trial counsel's failure to object during closing. For the reasons stated in the Court's findings regarding the prosecutorial misconduct claim, the Court finds that Petitioner cannot establish prejudice on this ground.

> judge was going to give them and to apply that law. And here, the jury was properly instructed on the reasonable doubt standard by the trial judge. (See Discussion, Part II, ante.) Thus, any error was harmless.

(Pet. App. A at 20-21.)

The Court finds the appellate court's decision to be a correct application of Supreme Court precedent. Even assuming that the prosecutor misstated the law, Petitioner was not deprived of a fundamentally fair trial, and therefore his due process rights were not violated. The trial court issued an instruction to the jury containing an undisputedly correct reasonable doubt standard before the trial began and again prior to deliberations. (CT at 205, 215.) Furthermore, the trial court instructed the jury that if they "believe[d] that the attorney's comments on the law conflict with my instructions, *you must follow my instructions*." (CT at 210) (emphasis added). In light of the jury charge and as the Court does not find the prosecutor's comments to be objectionable, the Court finds that Petitioner was not deprived of a fundamentally fair trial by the prosecutor's comments. Thus, Petitioner is not entitled to habeas corpus relief on this ground.

### D.     Ground Four: Imposition of Upper Term

Petitioner contends that the trial court's imposition of the upper terms violated his Sixth Amendment right to a jury trial and Fourteenth Amendment right to due process of the law.[6] Petitioner's argument is derived from *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny. In *Apprendi*, the United States Supreme Court overturned a state sentencing scheme as violative of a criminal defendant's right to have a jury verdict based on proof beyond reasonable doubt. The sentencing scheme permitted a trial judge to enhance a defendant's penalty beyond the prescribed statutory maximum upon a finding by a preponderance of the evidence that the defendant committed the crime with racial animus. *Id*. at 469. The Supreme Court held that the Sixth Amendment right to a jury trial required that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to jury, and proved beyond a reasonable doubt." *Id.* at 490.

---

[6] The United States Supreme Court has previously stated that, "the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 246 n. 6) (1999). In *Apprendi v. New Jersey*, 530 U.S. 466, 475 (2000), the Supreme Court recognized that "[t]he Fourteenth Amendment commands the same answer."

In *Blakely v. Washington*, 542 U.S. 296, 303-304 (2004), the high court explained that the "statutory maximum" is the maximum sentence a judge may impose based exclusively on the facts reflected in the jury verdict or admitted by the defendant and not the maximum sentence a judge may impose after finding additional facts.

The United States Supreme Court subsequently found that the imposition of upper terms, as delineated in California's Determinate Sentencing Law, based on facts found by a judge violated a criminal defendant's constitutional rights. *See Cunningham v. California*, 549 U.S. 270, 293 (2007) (overruling *People v. Black*, 35 Cal.4th 1238 (2005)). The *Cunningham* court noted that the middle term specified in California's statutes was the relevant statutory maximum for the purpose of applying *Blakely* and *Apprendi*. The high court thus concluded that the imposition of the upper term based solely upon a trial judge's fact finding violated the defendant's Sixth and Fourteenth Amendment rights because it "assigns to the trial judge, not the jury, authority to find facts that expose a defendant to an elevated 'upper term' sentence." *Id.* at 274.

The California Court of Appeal rejected Petitioner's claim that the imposition of the upper terms violated his constitutional rights. (Pet. App. A at 23.) Relying on the California Supreme Court's decision in *People v. Black*, 41 Cal.4th 799, 806 (Cal. 2007) (hereinafter "*Black II*"), the appellate court found that only one aggravating factor need to be proven for the imposition of the upper term and that the trial court had relied on Petitioner's previous convictions as an aggravating factor.[7] (Pet. App. A at 23-24.) The State appellate court observed that a prior conviction was exempted from the *Apprendi* rule and need not be proven to a jury beyond a reasonable doubt. The Court finds the California Court of Appeal's reliance on *Black II* is appropriate as clearly established Supreme Court precedent does provide that a prior conviction is exempt from the requirement of a jury finding and can be found by a judge. *See Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998) (holding that fact of prior conviction need not be pleaded in an indictment or proved beyond a reasonable doubt); *see also Apprendi*, 530 U.S. at 490 (emphasis added) (*"other than the*

---

[7] The Ninth Circuit has found that federal courts are bound to accept the state court's interpretation of state law and thus "under California law, only one aggravating factor is necessary to set the upper term as the maximum sentence." *See Butler v. Curry*, 528 F.3d 624, 643 (9th Cir. 2008).

1  *fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed
2  maximum must be submitted to a jury, and proved beyond a reasonable doubt"); *United States v.*
3  *Grisel*, 488 F.3d 844, 846 (9th Cir. 2007) (en banc).  Here, the California Court of Appeal observed
4  that "[i]n light of the trial court's findings that Lopez was convicted of prior felonies and served prior
5  prison terms for felony convictions, and the lack of any apparent mitigation, the record amply
6  establishes that the trial court could have imposed the upper term." (Pet. App. A at 24.)  The Court
7  does not find this decision to be an objectively unreasonable application of *Apprendi* and
8  *Almendarez-Torres*.  Thus, the Court finds that Petitioner is not entitled to habeas corpus relief as his
9  constitutional rights were not violated.

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   October 20, 2010**            /s/ John M. Dixon
                                         UNITED STATES MAGISTRATE JUDGE